# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

CHRISTINE K. BLUM,

            Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,[1]

            Defendant.

No. C06-3029-MWB

**REPORT AND RECOMMENDATION**

---

## *I. INTRODUCTION*

    The plaintiff Christine K. Blum ("Blum") seeks judicial review of a decision by an administrative law judge ("ALJ") denying her application for Title II disability insurance ("DI") benefits. Blum claims the ALJ erred in discounting the opinions of her long-time treating physician, and improperly evaluating Blum's credibility. (*See* Doc. Nos. 8 & 10)

## *II. PROCEDURAL AND FACTUAL BACKGROUND*

### *A. Procedural Background*

    On April 9, 2003, Blum filed an application for DI benefits, alleging a disability onset date of February 1, 2000. Blum claims she is disabled due to lower back pain that prevents her from lifting over ten pounds and precludes any repetitive bending or twisting, or standing or sitting for more than one hour at a time. She also alleges she is disabled due to hypoglycemia. (R. 77) Blum's application was denied initially and on reconsideration. On May 24, 2005, a hearing on the applications was held in West Des Moines, Iowa,

---

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA"). On February 12, 2007, Michael J. Astrue became Commissioner of Social Security. He therefore is substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d)(1).

before ALJ John E. Sandbothe. Blum was represented at the hearing by non-attorney Maureen Nowak. Blum testified at the hearing, and Vocational Expert ("VE") Elizabeth Albrecht also testified. At the hearing, the ALJ granted Blum's request to amend her alleged disability onset date to May 31, 2002. (R. 275-76; *see* R. 12) On October 18, 2005, the ALJ ruled Blum was not disabled and not entitled to benefits. (R. 12-18) Blum appealed the ALJ's ruling, and on March 14, 2006, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. 4-7)

Blum filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 1) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Blum's claim. Blum filed a brief supporting her claim on September 24, 2006. (Doc. No. 8) The Commissioner filed a responsive brief on November 17, 2006. (Doc. No. 9) Blum filed a reply brief, also on November 17, 2006. (Doc. No. 10) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Blum's claim for benefits.

### B. Factual Background

### 1. Introductory facts and Blum's hearing testimony

At the time of the hearing in May 2005, Blum was forty-three years old. She was living with her husband of twenty-four years, and their two children, ages nine and thirteen. She is a high school graduate, and completed one semester of business college following high school. She has no trouble with reading or comprehension, and she keeps track of her own finances. (R. 276-77)

Blum stated she is 5'8" tall, which is one inch shorter than she was before she had back surgery in 2000. At the time of the hearing, she weighed 162 pounds, which she

2

stated was about twenty pounds heavier than before her surgery. She attributes the weight gain to her medications. (R. 277)

At the time of the hearing, Blum was working part-time as a reservation clerk, from her home. She stated the job required little or no lifting. She worked six to eight hours a week, in the evenings, and she was able to change positions from sitting to standing and rest as needed. She had not worked at all during the month prior to the hearing. (*Id.*; R. 293)

From September 15, 2001, to February 25, 2002, Blum worked part time, three to four hours in the evenings, as a portrait photographer at Sears. She had no prior training and learned on the job. She had to lift twenty-five to thirty pounds on occasion, She left the job because she had difficulty with the lifting involved. (R. 70, 279)

She worked in food service at Bagel Depot from 1998 through September 2000, when she quit working due to her medical condition. The job was part-time, and required her to lift up to thirty pounds. (R. 71, 279) Concurrently, she worked about seven hours per week doing child care in her home. The job required her to lift toddlers who weighed about thirty pounds. (R. 70, 279) She stopped doing child care because she was home-schooling her children, and she felt they needed more of her attention. (R. 70)

The job Blum held the longest was as a programmer aide at a computer factory, where she worked from 1981 to 1991. In that job, she did filing and typing, assembled orders for shipping, received and sorted mail, and prepared order forms. The job required her to lift up to ten pounds frequently, but never more than ten pounds. (R. 78)

Blum stated she has limited ability to lift, sit, stand, and walk, due to pain in her lower back and legs. She underwent surgery in September 2000, to "remove[] a piece of bone that was pinching a nerve from [her] back." (R. 280) After the surgery, Blum's symptoms were relieved for about six months, and then she began noticing numbness in her left leg and some back pain. Beginning in May 2002, she began seeing her family

3

doctor about her pain, and her doctor referred her to the Mayo Clinic for evaluation. (R. 280-81)  According to Blum, doctors at the Mayo Clinic advised her that on a four-point scale, her back condition was rated as a 2.  They do surgery when a patient's condition reaches level 3 or 4, so they advised Blum "to try and live with it until it got to a point where [she] just couldn't take the pain any longer."  (R. 281)

Blum tried physical therapy and injections, neither of which was helpful in relieving her pain.  She takes medications that help somewhat, but she still experiences pain at all times, and nothing completely relieves her pain.  Her pain is exacerbated if she sits or stands too long, lifts more than ten pounds, twists, or otherwise engages in excessive movement.  She described the consequences of over-activity as a feeling of pressure in her back that is relieved by lying down on the floor for twenty minutes with an ice pack on her back.  She stated she lies down for about forty-five minutes mid-day to relieve fatigue and back pain.  She lies down again in the evening after supper for about thirty minutes. (R. 281-83, 285)

Blum stated she is learning not to do any one activity for too long a time, and she changes positions and activities frequently in an attempt to prevent an exacerbation of her pain.  She estimated she can stand or walk for twenty to thirty minutes before she will begin to feel pain in her lower back.  If she uses a special cushion, she can sit for about thirty minutes at a time, or for about fifteen minutes at a time without her cushion. Changing positions from sitting to standing and vice versa relieves her pain enough that she can continue with a different activity until she has to sit/stand again.  (R. 283-84, 295) Blum can go grocery shopping for up to thirty minutes at a time, but she has her daughter push the cart.  She stated her most comfortable position is lying down.  (R. 284-85)

Blum home-schools her two daughters, which requires four to five hours of her day. She is able to sit, stand, and walk around as needed while she reviews materials with her daughters.  She indicated she reviews a subject matter with them, and then the girls do the

4

assignments on their own. (R. 285-86) Her daughters also take a few classes and engage in some activities in public school. If she attends one of her daughters' activities, she either brings her own chair or she sits next to an exit so she can get up and walk around. If her daughter has two volleyball games in a row, Blum will use the break in between the games to lie down in her van for awhile. (R. 288, 294) The family attends church on Sundays, and her oldest daughter participates in the church youth group. Blum estimated she is out of the house two to three hours a week in connection with church functions. (R. 293-94)

Blum estimated her daughters do seventy-five percent of the housework. Blum does most of the cooking, and she is able to sweep the floor and clean the bathroom. Her daughters usually do the vacuuming. Blum prepares supper a little at a time throughout the day because she cannot do it all at once. She stated that to accommodate her physical limitations, she has moved her storage containers from a bottom drawer to a cupboard so she will not have to bend over to get to the containers. She has no difficulty reaching upward with her arms, and no problems writing or holding onto anything. She has difficulty twisting, and stated her doctor has advised her to limit twisting. She stated this has required her to learn new ways to do things, such as getting into and out of the car. She can kneel down, but has to arise slowly, and she doubted she could kneel down and get back up frequently during a day. Climbing stairs is difficult for Blum, and she has to use a railing for support. Descending stairs is less difficult for her. (R. 286-88, 290-91) Blum indicated her family relies on their garden for about 50% of their produce, and it is becoming increasingly difficult for her to work in the garden. She stated her daughters have taken on increasing responsibility for the garden each year. (R. 291)

Blum can drive, but stated she has difficulty driving due to arthritis in her right fingers, and holding her foot on the accelerator bothers her ankle. The farthest she can drive at one time is about fifteen miles. (R. 292)

5

Blum stated her medications cause her energy level to be low, but she does not have difficulty concentrating. She sleeps relatively well at night, and has no problems with balance or dizziness. She stated that since her surgery, she has developed arthritis, which worsens during cold weather. She stated the only medical treatment she receives currently is periodic increases in her medication dosage. (R. 288-89)

Blum indicated she would be unable to work at a full-time job. When she is at home, she is able to engage in more or less activity as needed, and she can make adjustments to her pain medications to compensate for days when she is more active. She fears she would be unable to perform a full-time job, day after day, where she would lack the ability to rest and take more pain medication if her back pain increased. (R. 289-90)

**2.      *Blum's medical history***

As noted previously, Blum's amended alleged disability onset date for purposes of this review is May 31, 2002. Medical records predating that time indicate Blum had a herniation of the L4-5 disc in August 2000, and she underwent an L4-5 laminectomy and diskectomy on September 21, 2000. She did well postoperatively and reported that her leg pain was gone. She continued to improve for the first six months after surgery, and then developed some left leg pain that apparently worsened over the next eighteen months. By May 31, 2002, she reportedly could stand for only five minutes at a time before her leg would hurt down into her foot. She was treated with Prednisone which improved her leg pain, but made her more aware of low back pain. (R. 115-24, 208-13) By August 2002, she was complaining of low back pain and left leg pain into her foot, with weakness in her lateral upper thigh, and some numbness in her leg. Prolonged standing and sitting increased her pain. (R. 206)

Blum's family doctor, Mark Mahoney, M.D., referred her to David W. Beck, M.D., a neurological surgeon, for consultation. An MRI was performed on August 16,

6

2002.  The MRI results indicated new "[a]cute to subacute fractures of portions of the end plates of L4 and L5 adjacent to the L4-5 disc."  (R. 217)  X-rays showed "[d]egenerative changes of the mid and lower lumbar spine with degenerative Grade I spondylolisthesis at the L4-5 and L5-S1 levels."  (R. 216)  Blum was advised to obtain a neurologic or neurosurgical consultation.  (R. 206)  In late September 2002, Blum was seen at the Mayo Clinic for evaluation.  (*See* R. 125-63)  Mayo physicians reviewed Blum's MRI and X-ray results, and noted "severe degeneration of L4 on L5 and L5 on S1[.]"  (R. 160)  Blum was taking Celebrex and Ultram for pain, which she reported helped, but did not eliminate, her pain.  (*Id.*)  Blum was given physical therapy while she was at the clinic, and she was given a trial of a transcutaneous electrical stimulation unit (known as a "TENS unit") over her lumbar paraspinal area.  (R. 154)  A nerve conduction study of her left lower extremity was normal.  Needle examination of her left lower extremity produced minimal findings, mostly "consistent with a mild, longstanding, left S1 radiculopathy."  (R. 150)  A myelogram showed "only postoperative changes without any residual root compression."  (R. 143)  The consulting physician did not believe surgery would relieve Blum's current symptoms.  (*Id.*)  Blum was instructed in a home exercise program and use of the TENS unit, which had provided her some relief during her stay at the clinic.  (R. 137, 140)  She was scheduled for some gynecological surgery unrelated to her disability claim, and she was advised to obtain her doctor's clearance after that surgery before beginning the home exercises.  (R. 137)  At a follow-up examination on October 21, 2002, Blum reported she had begun the home exercise program and she was tolerating the TENS unit well.  (R. 128)

    On December 11, 2002, Blum saw Dr. Mahoney with complaints of pain down her leg after thirty to forty-five minutes of standing.  Her pain would resolve after she sat down.  Dr. Mahoney advised Blum there was nothing he could do for her, and if her pain worsened, she "would need to see the neurosurgeon again."  (R. 197)  On December 18,

2002, Blum called the Mayo Clinic neurosurgeon to report "new discomfort in the back of her knee and posterior leg . . . a pins and needles sensation." (R. 126) After discussing her symptoms with the doctor, Blum agreed to increase her nighttime dosage of pain medication, and "take a wait and see approach for now." (*Id.*)

On March 14, 2003, Blum continued to report "leg symptoms after shopping or with prolonged standing more than 20 mins." (R. 197) She was taking Desipramine at night, and Darvocet N 100 about three times per week for pain. Dr. Mahoney switched her from Darvocet to Lortab. (*Id.*)

On April 22, 2003, Dr. Mahoney wrote an opinion letter to a disability examiner in which he stated Blum would have "pain down her leg after standing for 20 minutes," and "significant lifting, carrying, standing, walking, stooping, climbing, kneeling, and crawling limitations," with no environmental limitations. (R. 199) Dr. Mahoney reiterated these opinions in a letter dated September 16, 2003, noting Blum's symptoms had not changed significantly since his April 2003 letter. (R. 192)

On June 9, 2003, Blum underwent a consultive examination by Mark D. Dankle, D.O., upon referral from Disability Determination Services. (R. 164-69) Dr. Dankle reached the following conclusions from his examination of Blum:

> I would recommend that she avoid heavy lifting and frequent bending. I believe that she is capable of lifting up to 20# on an occasional basis. She should avoid prolonged standing, moving about, walking, or sitting and likely will do best when she can change positions on a regular basis as necessary. She should avoid stooping, climbing, kneeling or crawling. I see no limitations in regards to handling objects, seeing, hearing speaking, or traveling. I see no limitations regarding work environment.

(R. 166)

On July 1, 2003, J.D. Wilson, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form regarding Blum. (R. 170-75) He opined

8

Blum would be able to lift/carry ten pounds frequently and twenty pounds occasionally; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday (noting Blum must alternate between sitting and standing periodically to relieve pain or discomfort); and lift/carry without other limitations. Dr. Wilson found Blum's claim that she cannot stand for more than twenty minutes at a time without experiencing pain and numbness in her leg to be consistent with her reported activities of daily living. However, he further found her numerous daily activities to be inconsistent with her claim that she cannot sit for more than one hour at a time. (R. 174-75) On October 1, 2003, Claude H. Koons, M.D. reviewed the record and concurred in Dr. Wilson's assessment. (R. 176)

Blum continued to see Dr. Mahoney for follow-up of her back pain, and he continued to refill her pain medications. On August 1, 2003, he gave Blum written restrictions of no lifting over ten pounds, no standing for more than ten minutes at a time, no walking for more than fifteen minutes at a time, and no sitting for more than thirty minutes at a time. (R. 233)

On September 11, 2003, Blum was evaluated at the Mercy Pain Clinic by Richard L. Wilson, M.D., upon referral from Dr. Mahoney. Dr. Wilson found Blum to be a poor historian with questionable motivation to return to full functioning or to work. After spending considerable time examining and counseling with Blum, they decided on a trial of Tramadol. (R. 231-32) She returned to see Dr. Wilson on September 26, 2003, and reported "the burning pain in her back and legs that she previously described [was] pretty much gone," and her sleep had improved. (R. 230) The doctor noted the following: "[Blum] does have a relatively high opinion of her level of disability despite a fairly benign examination. No apparent distress and also describing a fairly high level of work at the home including helping her husband tear down a barn. She pretty much participates in any

9

activity that is required. She does have some discomfort after the fact." (*Id.*) The doctor continued Blum on a regimen of Ultram and was pleased with her progress overall. (*Id.*)

At Blum's next follow-up with Dr. Wilson, on October 27, 2003, she stated her pain levels were unchanged. She noted that if she took Tramadol more than three times daily, it made her "exceedingly tired." (R. 229) Dr. Wilson noted the following from his evaluation:

> [Blum] as we understand it has actually applied for disability. From my perspective if she is actively applying for disability that may just well be counterproductive to her pain treatment because if she is not motivated to be active and to perform gainful work then I am concerned that she has minimal motivation to report positive effects to any treatment, [let] alone medical treatment therapies that really do not matter so much. She reports a pain level of 4 out of 10. Her activity level is unchanged. I continue to be of the opinion that Ms. Blum has an exaggerated sense of disability and she does have significant functional capacity to be exploited in the work force if she so desires. Certainly if she chooses to stay at home that is her choice, but the idea that this lady is disabled from work is on the verge of absurd. From my perspective her examination is really benign. . . . She had an epidural steroid injection times one to no avail. I am not convinced at this point given her apparent motivation towards disability that any injections are going to be of any great value. I would like to see this disability thing settled once and for all before we do that. . . .
>
> This is a relatively difficult case because this patient is in the limbo of disability versus nondisability and as such I think just the limbo itself is counter to patient function and wellness.

(*Id.*)

Dr. Wilson found Blum's condition to be unchanged at her next follow-up visit, on November 26, 2003. He started her on a trial of Bextra, and kept her on her current pain medications. He noted Blum "continues to complain fairly bitterly of back pain and leg pain," as well as side effects from her medications including increased somnolence from

10

Tramadol and elevated blood sugar from Lortab (the latter being a side effect unknown to the doctor). (R. 228) Dr. Wilson saw Blum again on January 7, 2004, and noted, "She certainly continues to have a much higher perception of her level of disability than is obvious. She remains well groomed and continues to complain of this back and radicular pain, but her function seems to be relatively high from my perspective." (R. 227) Blum had not noticed much effect from the Bextra, so the doctor discontinued it and continued her on the Lortab 5/500, twice daily as needed and two at bedtime. (*Id.*)

Blum saw Dr. Wilson on February 23, 2004, and expressed disappointment that she was not having less pain. They discussed various adjustments to her medications, and the doctor noted Blum "essentially had underlying osteoarthritis," which likely was the cause of her morning stiffness. (R. 226) On February 24, 2004, Blum complained to Dr. Mahoney of occasional numbness in her right leg. (R. 186) On March 15, 2004, she called Dr. Mahoney and reported "pain down her left leg that sound[ed] radicular in nature and similar to how her radicular pain started on her right leg." (R. 186) When Blum saw Dr. Wilson again on April 5, 2004, they discussed the possibility of trigger point injections, which could reduce Blum's reliance on pain medications, something she expressed a desire to do. Dr. Wilson noted Blum's pain lessened with decreased activity and he indicated, "I think we need to continue to be supportive of this." (R. 225) On May 4, 2004, Dr. Wilson administered two trigger point injections into Blum's low back. (R. 224) Although the doctor's notes indicate he planned to follow up with Blum to see if she had any positive outcome from the injections, notes from her next visit on June 7, 2004, do not mention the injections. At that time, Dr. Wilson indicated Blum's condition was "pretty stable"; she was "not terribly interested in pushing the medications or pushing her treatment"; she was "doing as well as one might be expected"; and she was "most certainly . . . not physically disabled on a significant level." (R. 223) He further noted

11

Blum "pretty much does what she wants to do," and she continued to have "a much higher perception of her level of disability than is generally evident." (*Id.*)

In May 2004, Blum developed pain around the dorsum of her right wrist and distal forearm, as well as her elbow. She reported pain with use, achiness at night, and stiff fingers in the morning. She had occasional tingling in her right hand and noted her right hand was cooler than her left. Dr. Mahoney noted Blum had experienced an infection in her elbow in October 2003, and she had experienced worsening pain around her wrist, forearm, and elbow since that time. He referred Blum to a specialist for consultation to consider reflex sympathetic dystrophy. (R. 185, 253) R. Bruce Trimble, M.D. evaluated Blum's hand discomfort and opined she did not have reflex sympathetic dystrophy. Instead, he thought Blum might be "positioning herself in a somewhat odd way at night." (R. 244) He reassured Blum about her symptoms and suggested she consider increasing her dosage of Naproxen. (*Id.*)

On May 28, 2004, Dr. Mahoney completed an evaluation form concerning Blum's work-related abilities. (R. 179-82) He opined Blum could lift ten pounds occasionally; stand and/or walk for at least two hours in an eight-hour workday; push/pull no more than twenty pounds; and perform all postural activities occasionally. He indicated Blum occasionally would have limited ability to reach in all directions, but unlimited ability in handling, fingering, and feeling activities. In Dr. Mahoney's opinion, Blum would be unable to sustain a six- to eight-hour workday, five days per week. (*Id.*) Notably, Dr. Mahoney indicated Blum's ability to sit would be unaffected by her impairment, and he did not check the box indicating Blum would need to alternate between sitting and standing periodically to relieve pain or discomfort. (R. 180)

Blum continued to complain of back pain when she saw Dr. Mahoney. On September 17, 2004, he prescribed a course of steroids. (R. 251) Blum saw Dr. Mahoney on September 21, 2004, complaining of increased back pain after being on a riding

12

lawnmower the previous day. She stated her pain was worse in certain positions. She indicated the course of steroids had improved the pain in her wrist, knees, elbows, and ankles, but not in her back. An x-ray showed no changes from previous films. The doctor increased the dosages of Blum's pain medications. (R. 250)

On December 17, 2004, Dr. Mahoney completed an updated statement of Blum's ability to do work-related activities. (R. 245-48) He opined Blum could lift/carry less than ten pounds, stand and/or walk for less than two hours in an eight-hour workday, sit for less than six hours in an eight-hour workday, and push/pull no more than ten pounds due to the effect pushing/pulling would have on her back. He noted Blum suffers from "chronic pain without activity" and "exacerbation of her back pain in the [activities of daily living]." (R. 246) He indicated fatigue had a moderate effect on Blum's ability to function, and opined she would be unable to sustain a normal workday, five days per week, due to fatigue and pain. (*Id.*) Dr. Mahoney stated Blum should never crouch, crawl, or stoop, and she should climb, balance, and kneel only occasionally. (*Id.*) He indicated Blum should have only limited exposure to vibration, which could exacerbate her back pain; hazards, because she might be unable to respond quickly to unexpected dangers; and fumes, odors, chemicals, and gases, because of her allergies and "panic with anesthesia mask." (R. 248)

The record also contains a medical source statement dated October 27, 2005, from Scott Nelson, D.C., that is largely consistent with Dr. Mahoney's statement. (R. 257-60) However, because the record contains no examination or treatment notes from the chiropractor, the court finds his statement regarding Blum's work-related abilities to be of little value in the present inquiry.

Dr. Mahoney completed a vocational rehabilitation evaluation form on October 28, 2005, in which he indicated Blum is limited to standing for fifteen minutes at a time and sitting for thirty minutes at a time, with a forty-five minute rest in between sitting and

13

standing. He indicated Blum's further treatment would include medications and "continued chiropractic care." (R. 263) Based in part on Dr. Mahoney's assessment, Blum was deemed eligible to receive vocational rehabilitation services as of November 18, 2005. (R. 261-62)

From January 13-25, 2006, Blum underwent a work evaluation at North Iowa Vocational Center, for the purpose of determining her "mobility and work tolerance in relationship to competitive employment." (R. 269) The evaluators found Blum to be pleasant, cooperative, eager to learn new skills, and able to accept supervision and work well with others. Blum expressed interest in working in a clerical position, and she demonstrated appropriate skills and demeanor to do so. However, the evaluators indicated Blum "has somewhat low stamina and endurance" (R. 271), and she would need accommodations in order to sustain employment, including "working no more than two and a half hours per day, every other day," which would "allow her to rest in between scheduled days." (R. 272)

### 3. *Vocational expert's testimony*

The ALJ asked the VE to consider a forty-three-year-old woman with Blum's education and work background with the following limitations: "lift no more than 20 pounds occasionally and ten pounds frequently, she could stand and walk no more than two hours total during a work day, she could only occasionally balance, stoop, crouch, kneel, crawl or climb." (R. 298) The VE stated such an individual "could only do sedentary work," and would be unable to return to any of Blum's past relevant work. (*Id.*) However, the individual would be able to perform other work due to the skills she gained in the shipping and receiving job. For example, the individual would be able to work as an order and correspondence clerk, a service clerk or dispatcher (except for police, fire, and ambulance), or a repair order clerk, all of which are semi-skilled jobs. (R. 299)

14

The ALJ next asked the VE to consider the same individual, with the added limitations that she would require two or more absences from work per month; she could not stand or walk for more than two or more hours, total, during a workday; and she could not sit more than four hours, total, during a workday. Therefore, she would have to lie down for the rest of the workday. The VE indicated such an individual would be precluded from all competitive employment. (R. 299-300)

### 4. *ALJ's decision*

Although the ALJ found that Blum could not return to any of her past relevant work, he found she retains the residual functional capacity to perform other work. The ALJ found Blum retains the residual functional capacity to lift/carry up to twenty pounds occasionally and ten pounds frequently; stand and walk for two hours in an eight-hour workday; and perform all types of postural activities occasionally. With this RFC, the ALJ found Blum can perform jobs such as order clerk, service clerk, and repair order clerk. The ALJ found Blum's allegations concerning her limitations not to be fully credible, noting her allegations are undermined by her daily activities. He further noted Blum's "income dropped when she began home schooling her children, indicating she could probably work more but was focusing on her home school activities." (R. 16) The ALJ observed that a claimant does not need to be free of symptoms in order to be found able to engage in substantial gainful activity. (*Id.*; *see generally* R. 12-18)[2]

---

[2]The court notes the ALJ's discussion of Blum's medical history is somewhat confusing because he repeatedly mixes up the names of Blum's treating physician Dr. Mahoney and the agency consultant Dr. Dankle. *See* R. 14 (noting "Dr. Mahoney limited [Blum] to work at the sedentary exertional level" and, three sentences later in the same paragraph, "Dr. Dankle opined [Blum] had pain and fatigue that would preclude[] her from working 6 to 8 hours a day"); and *id.* (noting "Dr. Mahoney completed a second evaluation" of Blum, and "Dr. Dankle opined further limitations for [Blum]. . . ."). From the record, the court concludes each of these references should be to Dr. Mahoney.

15

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Hillier v. Social Security Admin.*, ___ F.3d ___, 2007 WL 1412404 at *3 (8th Cir. May 15, 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003. First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such

16

abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, ___ F.3d ___, 2007 WL 1215759 at *3 (8th Cir. Apr. 26, 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996).").

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for

17

providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove

18

disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, ___ F.3d ___, 2007 WL 1215759 at *2 (8th Cir. Apr. 26, 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page, supra* ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall

19

evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page, supra*, at *2 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations

are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)     the claimant's daily activities;
> 2)     the duration, frequency and intensity of the pain;
> 3)     precipitating and aggravating factors;
> 4)     dosage, effectiveness and side effects of medication;
> 5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

21

## *IV.  DISCUSSION*

Blum argues the ALJ erred in failing to give proper weight to Dr. Mahoney's opinions regarding her ability to work.  She states that as her long-time treating physician, who has seen her "almost sixty times since 2000" (Doc. No. 8, p. 10), Dr. Mahoney "was in the best position to assess [her] condition." (*Id.*)  She argues his opinions are entitled to controlling weight because they are not inconsistent with other substantial evidence in the record. (*Id.*, pp. 11-14)  Alternatively, she argues that even if Dr. Mahoney's opinions are not entitled to controlling weight, they at least are entitled to great weight. (*Id.*, pp. 14-17)

Contrary to Blum's arguments, the court finds Dr. Mahoney's opinions regarding Blum's functional capacity are, in fact, inconsistent with other substantial evidence in the record.  Dr. Richard L. Wilson also was one of Blum's treating physicians.  He saw her every few weeks from September 11, 2003, through June 7, 2004.  Although Dr. Wilson recognized that Blum's pain decreased with lower levels of activity, he remained unconvinced that Blum was disabled throughout his treatment of her.  Rather, he noted Blum consistently had a more exaggerated view of the extent of her limitations than could be confirmed by the doctor's objective examinations.  He found her claim that she was completely disabled to be "absurd."  At her last appointment with him on June 7, 2004, Dr. Wilson opined Blum's condition was stable, and he noted she did not seem motivated to try other options to improve her symptoms.

Although the ALJ did not cite Dr. Wilson as the source of some of his conclusions, the ALJ observed that Blum was noted to show "signs of poor effort and exaggeration" (R. 14), and "there are indications in the record that [Blum] is overly dramatic and sometimes does not put forth full effort giving the impression she is more limited than she actually is." (R. 15)  These observations can only have come from Dr. Wilson's treatment

22

notes, in which the doctor consistently and repeatedly suggested Blum was exaggerating her condition to some degree.

In *Prosch v. Apfel*, 201 F.3d 1010 (8th Cir. 2000), the Eighth Circuit Court of Appeals discussed the weight to be given to the opinions of treating physicians:

> The opinion of a treating physician is accorded special deference under the social security regulations. The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). Consistent with the regulations, we have stated that a treating physician's opinion is "normally entitled to great weight," *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999), but we have also cautioned that such an opinion "do[es] not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995). Accordingly, we have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions, *see Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996).

> Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-2p.

*Prosch*, 201 F.3d at 1012-13.

Both Dr. Mahoney and Dr. Wilson are Blum's treating physicians. The ALJ justified his decision not to give Dr. Mahoney's opinion either 'controlling weight' or

Case 3:06-cv-03029-MWB   Document 12   Filed 05/23/07   Page 23 of 26

'great weight' by noting (1) Dr. Mahoney[3] is the only doctor of record who assessed Blum with the degree of limitation she alleged (R. 15); (2) Dr. Mahoney[4] failed to explain why he assessed Blum's condition differently when his treatment notes evidence no apparent change in her condition (R. 14); (3) the scope of Blum's daily activities belies her claim that she is disabled (R. 15-16); (4) Blum's income dropped when she began home-schooling her children, suggesting she was capable of earning more but chose to focus on her home schooling activities (R. 16); and (5) the record indicates Blum exaggerated her condition (R. 14, 15).

However, despite his justification for the weight he gave to Dr. Mahoney's opinions, the ALJ nevertheless failed to develop the record fully and fairly to support his decision that Blum is not disabled. As Blum points out in her brief, Dr. Mahoney, in his most recent statement of Blum's work-related abilities, and the state agency consultant, in his evaluation report, both indicated Blum requires the ability to change position frequently from sitting to standing. The ALJ failed to include that limitation in either his residual functional capacity assessment or his hypothetical questions to the VE. In addition, the ALJ did not have the benefit of Blum's work evaluation of January 2006, which was submitted to the Appeals Council. The court finds these two pieces of evidence are critical to a full evaluation of Blum's residual functional capacity and her ability to sustain competitive employment.

Moreover, although the court does not find fault with the ALJ's evaluation of Dr. Mahoney's opinions on their face, the court further finds that if the ALJ had questions regarding the basis for Dr. Mahoney's modified assessment of Blum's functional abilities, then the ALJ should have requested clarification from the doctor. The relevant question "is whether medical evidence already in the record provides a sufficient basis for a

---

[3]Mis-identified as Dr. Dankle. *See* note 2, *supra*.

[4]Again, mis-identified as Dr. Dankle.

24

decision in favor of the Commissioner." *Scott v. Apfel*, 89 F. Supp. 2d 1066, 1076 (N.D. Iowa 2000) (Bennett, C.J.). In this case, the ALJ noted Dr. Mahoney had offered no justification for his opinion that Blum's work-related limitations had increased. Because Dr. Mahoney had been Blum's primary treating physician for over five years, the court finds Blum was prejudiced by the ALJ's failure to seek clarification from Dr. Mahoney. The Eighth Circuit Court of Appeals has noted the relevant inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)). Here, the court finds Blum was prejudiced by the ALJ's failure to develop the record fully and fairly to support his decision.

The undersigned therefore finds this matter should be remanded for further proceedings. Upon remand, the Commissioner should be directed to develop the record more fully and fairly by including in Blum's residual functional capacity assessment, and in hypothetical questions to a vocational expert, the fact that Blum must change positions frequently from sitting to standing; by obtaining additional medical evidence from Dr. Mahoney regarding the basis for his evaluation of Blum's work-related limitations; and by considering the January 2006 work evaluation and other appropriate evidence.

## V. CONCLUSION

Accordingly, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[5] to the Report and Recommendation in

---

[5]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Case 3:06-cv-03029-MWB   Document 12   Filed 05/23/07   Page 25 of 26

accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed above.

**IT IS SO ORDERED.**

**DATED** this 22nd day of May, 2007.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT